The Honour, this case concerns a violation of one of the most fundamental tenets of summary judgment practice, which is that on summary judgment the district court is not to weigh the evidence but is to allow the weighing of the evidence to be done by the jury. The very excellent brief by the Appalachians, I think you can't conclude anything except that it is nothing but a weighing of the evidence or what they call a laundry list of evidence of age discrimination. How have you even shown a prima facie case in your brief? I know the district court assumed you satisfied that burden, but we're here on de novo review and I don't see in your brief that you really even bother to show why she's made a prima facie case. Well, basically we didn't bother to say much about it, Your Honour, because they didn't argue that we had not. They make a one-sentence statement that they dispute that we made it, but there's no argument that we didn't make it. And to me, to me the reason You're talking about in their response brief. In either brief. I can't say that they argued No, I'm talking about the brief here. They filed a response brief. You filed an opening brief in a reply. You didn't make, you didn't show a prima facie case in your opening brief. They say in the reply brief you haven't shown a prima facie case and you don't even respond to that in your reply. I'm just curious, how have you demonstrated a prima facie case on de novo review? All right, well, let me answer the question directly, Your Honour. To me there's a prima facie case because the evidence was that she had been the director of managed care for 14 years. Shortly before, some months before she was told to retire, her department had been merged with another department that was headed by Mr. Morgan. I think there's a lot of contradictory evidence, but I'd say the best evidence is she remained the title of director of managed care. You can look at it like he was now the director because he was head of the department and he was a vice president. But all the evidence was that those two positions were going to be merged, they were going to be left. One position, Mr. Morgan announced that he was not staying, he was leaving. That was because the job that he had been doing, primarily dealing with physicians, I won't go into the detail about that, wasn't going to be continued. So these two merged departments were there, the department that had been headed by Mr. Morgan and the department that had been headed by the plaintiff. They were merged departments. Mr. Morgan's leaving, so the only logical person. Wasn't his position eliminated as well? No, sir, that's not true. He said, I think he testified that was a possibility, but he also said if I had stayed, I may have gotten the merged position. So what happened was... Okay, his position and her position were merged. That's right, Your Honor. Right. So those two positions were merged. Now there was only one logical candidate at that time to have the merged position, that was her. She's 65 years old because she's been doing it. According to her, she's been doing 99% of the whole job because here was her version of it. Because what he had been doing, one of the reasons he was leaving, what he had been doing, they were trying to rearrange the deals they were doing with the physicians. And they decided they weren't going to do that and he decided to leave. So she described the new position as being 99% of what she had been doing as director of managed care. That had been her job. So he left. At that point, there's only one logical person to have the position. The position is now called director of collaborative care. According to her, it's 99% of what I've been doing. But wasn't the decision made to merge the two positions, wasn't that decision made before he left? Yes, Your Honor. It had been made. So the question then, who's going to head the merged position? And there's only one logical person left to head it. She's rejected and approximately six months, well, they give it temporarily to an existing vice president who's 31 years old. And then about six months later, they give it to a 32-year-old person who, so far as the record has, has no experience. Certainly, he's a new hire. He has no experience at that particular hospital. Requisite master's degree? No, sir. He did not. No, sir. They advertised the position to have a master's. Therefore, she said, I'm not qualified and she did not apply. They went and solicited him. He didn't apply either. They went and solicited him to have the position and gave it to the 30-year-old, the 32-year-old. Working on his master's? Yes, sir. At a, at a, some online master's program he was. But, but that's not what the qualification said. It said to have a master's degree and they solicited him and ignored her and gave it to a 32-year-old. So the position, taken evidence in the light of Most Favorable Appointment, the position was her position that she had had and she's replaced by a 32-year-old. You know, after six months, she's replaced by a 32-year-old. So I don't see how that, when the district judge said, I assume there's a prima facie case, how could you assume anything else? And when the. Can I ask, I'm interested in Judge Barksdale's first question to you likewise. Do you accept that the law that we're looking at as to the elements of a prima facie case is reduction in force case law? And, and specifically, therefore, that your client would have to show that she was qualified to assume another position? Yes, sir. Do you accept that law? I accept that, but they, they, Mr. Morgan. So where did she show that she was. Well, because here's what Mr. Morgan said. Here's their evidence. They said, well, there's some duties in this new job that you don't have, that you haven't done before. But on the same page in his deposition, he said there is nothing that she could not learn to do. In other words, they never gave a legitimate nondiscriminatory reason for not offering it to her. They, they, they're the ones that didn't make their case because they never gave any legitimate nondiscriminatory reason for not offering it to her. That's why you moved off prima facie case. I didn't say anything to it, just like the district judge did. Now, Your Honor, frankly, I must have missed something in the record. I read it last night. I didn't see where they filed an additional brief to my reply. I must have just missed something. I'm not saying they did. They, we just had the normal procedure here. You filed a brief. Yeah. They filed a response. And I filed a reply. You filed a reply. Yes. And in their, in their response brief, they say you didn't make a prima facie case. They had a one-sentence statement. I agree. It's one sentence. Well, I thought it was so ridiculous it didn't, I mean, how could it, how could it be anything else when you've got a person who's been there for 30, been there for 14 years, she's always done a job of replacing with a 32-year-old. Some things are so ridiculous. Why, why do you, it doesn't have to be a rigid mechanism. There's no rule. I wouldn't assume that a court would think something is ridiculous. I think I'd respond to it. All right. Well, we, I agree that we did move right on from that, but the record overwhelmingly indicates a prima facie case. A prima facie case, as the Supreme Court has said, does not have to be rigid, mechanized, or ritualistic. That's the terms they used. And I don't see how it could be anything but a prima facie case when the guy takes over her duties. That's. In your brief, you list all these bullet points about why the reason they offer for her leaving Singing River is pretext. But in that part of your brief, you never cite to the record. So where, where are we supposed to find these points you, you make in your brief? Well, let's, Your Honor, I thought we did cite to it. Here, here's one of them. One of the main, it's not necessarily pretext, it's, it's evidence of discrimination. They never gave a legitimate non-discriminatory reason, but we gave various reasons of why it's age discrimination. At, at this point, I thought we just looked at whether the, whether there's substantial evidence in the record of age discrimination. For one of the pages, look at pages, Your Honor, 700 to 700. Mr. Wade, we, only one of us can talk, and I'm, I guess. I guess, Your Honor. Pages 17 through, starting at the bottom of 17 through 20, you cite all these factors, but you never have one cite to the record. I, I thought we cited them back in the facts. Well, are we supposed to go back then and match them up? I apologize for not putting them in there a second time, Your Honor. But they are in the facts part of the brief. In answer to your question, Your Honor, on pages 701 through 702 of the record is a testimony of Wendy Taylor. Your Honor. I'll just take this. That bar is a microphone at the top of that podium, so every time that paper hits it, it's just going to make a really loud noise, so you may just want to try to avoid having the paper hit that bar. I'm sorry, Your Honor. That's all right. I'm sorry. You think I know how to understand. Well, that, that's a new thing. What is the law? Is retirement always, a reference to retirement, is that always proxy for age, or does the law allow a company that's in a reduction of force to say, instead of firing you, those that are close, we want to help you get the retirement benefits? Your Honor, the most recent case is a Fitzpatrick v. Baker case that's cited in my reply brief, and the Fifth Circuit utilized retirement as, statements about retirement as being evidence of age bias. That's the most recent case, the Fitzpatrick v. Baker, where they said, we want you to retire, and they used it. I don't see, I don't see this as being like Hayes v. Biggins at all, because to me, or to a lay jury, if you say, we want you to retire, that is very similar to saying, we want you to leave because of your age. And apparently, in Fitzpatrick v. Baker, the panel in that case agreed with that. I thought the Court was saying it's contextual, and therefore, if we want you to retire, that I agree with you, to have the connotation, but if the, if the context is, we have to reduce in force, those of you that will be let off, that are near retirement, we're going to help you get retirement. That can't be, in that context, I wouldn't see how that could be a factor. Well, Your Honor, to me, to me, what Amherst is to draw from that is for the jury. She testified, she testified. I guess, and you're saying what the Court said in this recent case, but in Martin v. Baylor, didn't we say that the word retired does not, by its very use, prove that age was a motivating factor anymore? I think that's an accurate statement of what it said, and not exactly in the context, not exactly under the same facts as we had here when they confront her and say, you're going to retire, and she said, why? And they said, because we're getting rid of those persons that are, can retire and have the high salaries. It could be, here's the strongest evidence I thought we had of age discrimination to me, and Your Honor, I believe that the proper approach under this Court's precedence is saying whether under all the evidence, a reasonable jury could find age discrimination. Wendy Taylor, Mr. Holland, there's different things in the record about who made a decision, but Mr. Holland himself, the chief, the top man, the chief executive officer, said that he participated in the decision. He identified Morgan, the person who told us another person. He named the third person who denied they had anything to do with it, but Holland said, I participated in the decision, and then we called his secretary of 12 years. She was his secretary from 2005 until early 2014, and she said that his decisions, and she gave example after example, was permeated with age bias. He was the most colorful thing that he said. He said, you can teach a secretary to type, but you can't teach a secretary to be young and beautiful. He talked about the lawyer they had there as being too, it reached the age of 40 and being too crazy at that age to continue the job. He talked about all the secretaries and talked about how the secretaries, if they're young, they're fast and they can move about, and if they're older, if they're over 40, they're slow. And here was the most compelling thing about Ms. Taylor. She's 45 years old, and when he took over, he had been chief executive officer, and then a few months earlier, he moved up to chief operating officer, which makes him the top man. He became from second in charge to first in charge. When he became first in charge, he said, I'm leaving because I know that I'm 45 years old, and I'm leaving. They made a big deal out of her saying, and as I say, Judge Barstow, this is 703 in the record. They made a big deal out of, well, she couldn't give the exact dates and when he made these statements, but it's clear from the entirety of her testimony that it was throughout the time period when she worked for him, that was his criteria for women to be young and attractive. How is all of this admissible, these comments over this period of time? Your Honor, because he's the decision-maker. I'm not saying he's the decision-maker, but this is not the party saying he made that to her. This is a secretary saying it over some period of time. I'm just quite curious as to how it's admissible. Well, Your Honor, to me, if the question is whether you're biased because of age, evidence that you're age-biased would be clearly admissible. It's relevant evidence because it increases the probability the decision was made on age. It wasn't made about Ms. Lay. But to say, Your Honor, we have a decision-maker here who's biased against old people and we have an old person who's told to retire and yet it's up to the jury to decide whether this man in Ms. Lay's case is not prejudiced against older women, but in the case of nurses, he's prejudiced against old people. In the case of secretaries, he's prejudiced against them. In the case of lawyers, he's prejudiced against them. In every other context, he's prejudiced against them. Was she the decision-maker in the meeting in which they said whatever they said about retirement and that she would get the maximum retirement benefits or whatever was said? Who was present in that meeting with Ms. Lay? That was Mr. Morgan. Mr. Morgan made the statement and there was another person from personnel there that didn't have any decision. So Holland wasn't there? No, sir, but Holland himself testified that he participated in the decision. And he was the overall decision-maker for the whole method about which it was going to be done and the methodology that they described was we're going to get people that are eligible for retirement. Your Honor, Mr. Morgan, it doesn't make any difference if Mr. Morgan had a benign purpose. That is, he said, I think it'd be better that we let older people go. It'd be less of a hardship because you all can draw your retirement. I don't think that's a defense. Who selected her for this meeting? Who told her to come to the meeting? I'm not clear from the record, Your Honor. I don't recall who told her to come to the meeting. It wasn't Holland? I think that's a fair statement. I think that's... We have to take evidence in the light most favorable to him and we have to accept him at his word when he said he participated in the decision and he was the senior person. What's the record site to where he said he participated in the decision? Give me just a second, Your Honor. Your Honor, the bottom of my page is obscured by the clerk's stamp, but it's document 57-7, page 13. The clerk's stamp stamped over my record site there, but that's where it is. 57-7, page 13. He said he, Morgan, and Bond decided, but then we took Bond's deposition and he said he had nothing to do with it. So that left Morgan and Holland. It's on page 13 of his deposition. All right. Your Honor, then we had, like I say, their brief is an attack on the weight of the I'm so sorry, Your Honor. I was going to point out that we had two employees at the level Ms. Lay held. I agree they had a different immediate supervisor, but they had the same level of employment she had. One of them was director of IT services. One of them was an HR person. The HR person said she's 69. They chose from her department a 60 and a 65-year-old to be laid off and replaced her with a younger man. And then Ms. Murray, who was in, I'm sorry, Holland was in IT. Murray was in personnel. But in both of those positions, they replaced them with younger people, and they gave strong opinion testimony that it was all related to age. We think that was competent evidence as well. All right. Thank you, Counsel. All right. Thank you, Your Honor. Good morning, Your Honors. Thank you. Judge Barksdale, Judge Graves, Judge Higginson, may it please the Court. I'm Jacqueline Wrigley. I am privileged to stand before you today on behalf of Senior River Health System, which is the appellee in this matter. Now, I've got a presentation prepared for you all, and I'm happy and eager to answer any questions that you have. But a couple of things that I absolutely am compelled to point out before we move on is a few items that need clarification, I think, from the earlier argument that we just heard. One, our contention is that the appellate never makes out a prima facie case under the framework articulated by Judge Garrola in the decision that he reached at the trial court level. Two, the position of Chris Morgan, the supervisor for Ms. Lay, it was eliminated. Three, Brian Argo, who was the 31-year-old that was referenced earlier, who took over all the duties of Ms. Lay at the time, she separated from employment. He was the Executive Director of Finance when she left the system's employment, and when she left, he had to take on the very critical needs of what she did and what Chris Morgan did while they were still Senior River employees, but he still had to do his job as the Executive Director of Finance. And that brings me to a final point of clarification, which is that counsel opposite suggested that the system never offered a legitimate or nondiscriminatory business reason for the decisions that it made that that the system, in fact, offered 88 million legitimate nondiscriminatory business reasons. And when I reference that number, that is the audit adjustment that the system discovered in March of 2014. It was an overstatement of the accounts receivable, basically, and I'm not a math person. There was $88 million on the books, didn't belong on the books. So Mr. Holland, the newly of financial ruin. As the second largest employer in Jackson County, Mississippi, with over 2,000 employees, this was a significant problem, something that I certainly want to learn, wouldn't want to learn, you know, two months on the job, even though he was a long-time employee. He was new into the Chief Executive Officer role. And that day, when he discovered this overstatement of accounts receivable, that precipitated everything that came after. Um, the, uh, Mr. Holland met with all the department heads, including Mr. Morgan, to say, we have got to do something. We have got to take this system down to the studs to figure out what we can do to save it from the brink of financial ruin, because that's where it was going. 88 million dollars is not, um, is not an insignificant amount. I mean, I think objectively, we can look at that amount and realize that a tremendous response was necessary. So Mr. Holland met with Mr. Morgan and all the other department heads, but specifically Mr. Morgan, and said, we've got to do something about this department. The parties, they breached an agreement that two leadership positions within that department were not necessary. They could streamline the functions of each position into a lower-level management position. Did they bring in an outside consultant to talk to them about how to restructure or reorganize? Well, they brought in the Godby Group, and that group came in to look at the way they did their managed care contracts, which is kind of a term of, an industry term of art for the insurance agreements that the system had with Blue Cross Blue Shield or whomever, to see whether those agreements were structured in such a way that it best benefited the system. And certainly, that was part of the, um, just either overall business judgment, and then in responding to the 88 million dollar shortfall, because, like I said, they looked into every nook and cranny to determine what they were going to be able to do to save the system from bankruptcy. Now, Mr., um, Mr. Wade, as he, he argued before you earlier, he, he suggested that our categorization of his laundry list of evidence that he has supplied to you all, um, that that is, is perhaps unfair or that, in fact, he has presented a lot of evidence. Now, one thing to note, he skips over the, the bullet points that just, that Judge Barksdale, um, asked him about and goes straight to these remarks by Kevin Hollins. And now, the district court, uh, gave weight to those remarks as circumstantial evidence, but it found, and it correctly found this— Wait, remarks by whom? Mr. Hollins, when he was in the previous role. I didn't hear the name. Sure, sure. I apologize for that, um, Your Honor. So, the, um, the district court correctly found that these remarks, standing by themselves, are not enough to over, for the plaintiff to overcome that summary judgment hurdle. And that without some other evidence of pretext, that those remarks, standing alone, have zero probative value. Uh, the, the bullet points that we, we do— Now, Counselor, your argument is moving to the, how the bulk of your brief went, which is that the pre, non-pretext finding was correct, but you tossed in at the beginning that you were contending that there was no prima facie case here. Well, just to— But, but, but it's important for us to understand if you're making that as a coherent argument, because the district court assumed it. Your brief only mentions that responsibly in one sentence, and the law says it's a very low bar. So, exactly which element doesn't exist anywhere in this record? Sure. So, one in the, um, under the RIF framework, there are four elements. We can see that Ms. Lay could make out three of those four. The problem that she has is making out the element that, um, that she, uh, was qualified for another position. There is no dispute in the record that she, uh, she did not apply for another position. She's specifically the director of collaborative care position that, um, Justin Rickley filled in January of— What's the best case law on this element? Because qualified sounds different than applied for. Sure. And opposing counsel said that there's testimony that she was qualified for anything based on her experience. Well, I, I think that when, because it is a relatively low hurdle, that there would be case laws to suggest that on the merits of her, um, CV alone, that she may meet that element. Our point is that she, by failing to, by just assuming that the prima facie case— The district court assumed it. Sure. But the, the district court assumed that framework— Wouldn't we, even if you're right, wouldn't we have to remand? I don't think so. I think that the, um, because she, what the district court, the district court, and I'm not trying to speculate on its behalf, but it assumed that she could meet out the prima facie case because it contended that the parties analyzed the prima facie case under the incorrect framework. And so instead of going back and, um, and reanalyzing those, the, the, the record evidence with that framework, it just skipped over what is a relatively low burden that plaintiffs frequently meet in these— But if you're acknowledging her CV meets it and the district court assumed it, you would be asking us in the first instance to say, well, even though the CV shows it, they essentially waived it in front of the district court by citing the wrong legal standard? Is that what you're asking us to do? Well, I'm, I'm suggesting that the record, that if that, if they had, um, argued the prima facie case, then in all likelihood, they would make it out. Okay. Because it is such a low— So your argument has to be that they waived it in the district court, but the district court didn't rely on waiver. Correct. And I'm, I'm not suggesting that it was waived. All I'm saying is to Judge Marks— How would you recommend we resolve this case? I would recommend that you resolve this case by affirming Judge Girola's decision, because even with the prima facie evidence aside, assuming she, she meets it, and I think that's what we have to do here today, we assume that she meets out that prima facie case, she still does not have the substantial evidence to show that there was some kind of pretext on the part of the system. And she cites, uh, she makes various arguments, I think over a dozen in total. None of those arguments have any probative value. And in the end, when you have a laundry list, it still has to be of a caliber that is competent for proceedings like these. Because when the first point has zero probative value, the second point has zero, zero probative value, we find ourselves in a situation of zero plus zero plus zero still equals zero. And with Ms. Lay's inability to show that the system had some sort of pretext, then I submit that the district court's very well-reasoned 12-, 13-page opinion is, is correct, and that it should be affirmed on, um, on, on that basis in addition to the other arguments. Salient two points struck me that opposing counsel is pointing to is that a remark about retirement, even if best intention will just get you there under our law, is something that could give rise to an inference. So, certainly there are times when retirement status can correlate with, um, or can be evidence of, uh, of an employer's discriminatory motive. I submit to you that that is not what happened here, that it is merely, um, it's not some proxy, that her position was being eliminated. From a compassion standpoint, it said, how can we best maximize this person's, she's going to be— So the jury be the one that decides if this is a compassion versus a discrimination case? No, Your Honor, because the Fifth Circuit has held, and you identified this earlier, that retirement, simply uttering the word retirement is not enough to represent that proxy for age discrimination. There is a myriad of case law in the Fifth Circuit and other circuits to suggest this. They're cited in the, um, in the parties' briefs, but also the Fitzpatrick case that, um, that counsel opposite cited, in addition to the Dockery case, which is in his reply brief, both of those cases turn on the facts. They have, um, in, in Dockery, for example, it was a constructive discharge case founded on age discrimination, where one of the elements to consider in a constructive discharge analysis is, you know, continued harassment on something. And he submitted that he was repeatedly encouraged to retire, and that no reasonable person would have felt like he could stay in that, in that environment. That is factually distinguishable from these set of circumstances. The Fitzpatrick case, there were significant and substantial inconsistencies with the nondiscriminatory business reasons offered by the employer, such that in looking at the, the case globally, there was that substantial, that, the caliber of, of evidence that we have to see in these type cases to, uh, avoid summary judgment or to, uh, overturn, reverse the district court's opinion. That's just not what we have here. We do not have the competent summary judgment. Primary decision maker here was Morgan, and Morgan himself was her age, and he was also part of the RIF? Sure. He actually made a decision that was contrary to his own self-interest when he agreed with Kevin Holland that that department had to be restructured, that a lower-level management team member could lead that department. In doing so, he really, um, he kind of wrote out his own ending with the system. He knew that he didn't have a future there, and while Mr. Holland suggested to him, I would love to see, you know, see you stay around, he had operations experience, he was, you know, the vice president of clinical integration, um, he knew that there was just not an opportunity for him to do the kind of work that he needed to do. And so in May of 2014, he left, uh, on his own accord, knowing that his department had been completely changed. Is it, again, open to a jury to infer that when they bring in two 32-year-olds to replace two 50-year-olds, you could infer? I would suggest that the answer to that is no, Your Honor, and that is because, one, Brian Argo was already the executive director of finance with the system before the discovery of the $88 million shortfall in March of 2014. He was there. The discovery of the shortfall, March 2014. April 2014, the system is working on how to save itself from this dire financial situation and meets with, uh, Mr. Morgan, who then meets with Ms. Lay to let her know that, um, she's going to have to retire because the department is being restructured. Not until January of 2015 does the system bring in a new person to fill a completely different role. Certainly, it has some of the same functions, but Justin Rickley, the director, the current director of collaborative care, he performs tasks that Ms. Lay never performed, and the record, uh, her deposition testimony reflects that she didn't, for instance, participate in these population health initiatives, which are these, the hospital systems now are doing whatever they can to make money, particularly when you suffered an $88 million shortfall, and this is just one of the new, the new mechanisms for hospitals to be profitable. Tell us how Mr. Holland participated in the decision for her to be, for it to be suggested to her that she retire. Certainly. So, Mr. Holland, um, met with Mr. Morgan after the discovery of the shortfall, um, sometime in late March or early April 2014, said the department needed to be restructured. Mr. Morgan then met with Craig Summerlin, who was in human resources, and he worked as an advisor with these departments to make sure that things were being done in the appropriate manner, and they decided that the department could, um, that his position would be eliminated, Ms. Lay's position would be eliminated, and then that decision was ultimately blessed by Mr. Holland. So, he was there at that 20,000-foot view, said, hey, you need to go fix this. They brought him a, you know, the solution and how they planned to do it. He said that looks good. Then he moved on to the next department, because Ms. Ms. Lay's, yes, Your Honor. What evidence in the record concerning Mr. Holland saying, all right, those two positions can be eliminated, what, if any, evidence, uh, is there in the record as to any, uh, discriminate, age-discriminatory comments Mr. Holland might have made at that time when he said, all right, we'll get rid of these two positions? Sure. So, after the decision, the— He said, sure? No, Your Honor. I'm, sure isn't. I'm answering your question. Uh, first, he, um, looked at these things objectively from a business decision, and once the decision had been made, he said, well, how does this, you know, compassionately, how does this affect our employees? And from there, it, um, he learned that Ms. Lay was eligible for retirement, and he asked about what ways they could maximize her retirement status, and this is something he testified to in the record, that after the decision was made, then he said, well, what, you know, what benefit can we give these people? Because these are hard decisions, Your Honor. Tell me how it was more compassionate to recommend retirement than to just let her know that the position was being eliminated, and that she may be entitled to some benefits as a result of being laid off, or, tell, tell me how that it was determined that that was a compassionate approach to the elimination of her position. So, it, the elimination of her position in and of itself is probably not very compassionate. No, but I'm saying, your approach to the elimination of the position was this compassionate recommendation that she retire. How's that more compassionate than the alternative? So, the, what was compassionate about Ms. Lay's situation is that she was told in April of 2014 that she had to retire, her position was going to be eliminated, and then instead of shutting the door on her tenure with the system at that moment, they allowed her to stay on through the middle of June in order to maximize her retirement benefits. Now, what is your position as to why these comments by Mr. Holland about the age of employees are inadmissible? So, I, I think that I plan, if this for some reason is remanded back to the trial court, and we have to make the argument to keep those out, that they would fall under the they probably have an argument that these things come in as some kind of motive, and that it ultimately would be something that gets before a jury. I submit to you, though, that we shouldn't be at that point because not only were these comments unrelated to the employment decision at issue, comments that Ms. Lay never even herself heard, so remote in time that they couldn't be related, and Ms., Ms. Taylor, the, the person who purportedly heard the statements, she couldn't recall the specifics, she couldn't recall when they were said. She just knew at some point, eight or nine years ago, she heard Mr. Holland say these things. So, on the one hand, they fall into the stray remark. You're saying that Ms., Ms. Lay, the plaintiff, left the employee what year? In 2014. And you're saying these comments were made no later than, or at least nine years ago, 2005? That is what the record demonstrates, yes, your honor. Or at least that Ms. Taylor could not put a date stamp on when the comments were made. But even if these comments are given the weight that the, the district court gave them some circumstantial evidence weight, but found that because they are, it's the only circumstantial evidence, it has zero probative value because there is no other probative, there is no other circumstantial evidence to suggest that there was a pretext in the decision to separate Ms. Lay from, yes, your honor. Suggesting that evidence has zero probative value simply because it's not corroborated by some other evidence? No, I'm suggesting that, putting the remarks by Mr. Holland aside, I'm suggesting that the other, the bullet points that are referenced in the counsel opposite's brief, that those have zero probative value for a litany of reasons. All right. Well, I may have not understood what you were, what you were. Did that, did that clarify it, your honor? I guess. Okay. So with, with those things said, I think that it's important to, to know that Ms. Lay's burden is to come forward with evidence that is, that substantial evidence that shows that there was some sort of pretext in order to warrant a, a reversal of Judge Cabrola's well-reasoned decision. We submit to you all that that is, is not what's happened and respectfully, this court should affirm the decision of the lower court. You know, this four-part test for reduction in four circumstances, the fourth prong, evidence circumstantial or direct from which a fact finder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue. That's the same as the test for pretext, isn't it? I think that it is, it certainly sounds like the test for pretext, but the, the caliber of evidence that we need to overcome a pretext or to make a pretext argument is that substantial evidence, whereas on this level, it, we don't see the connotation of substantial being tossed around in case law that discusses this analysis. And with, with that, Your Honors, if there are no further questions, then I, we respectfully submit that the lower court's decision should be affirmed and I thank you very much for your time this morning. Thank you, Counsel. Butler. Your Honor, if I understood Counsel's argument, I think she conceded that there was a prima facie case in this case. I thought that's what she did. If she did, and then she turned right around and said, but there's no evidence of age discrimination. Well, Reeves, of course, that's the famous leading case. Reeves said that the prima facie case itself... You didn't happen to be involved in that case, did you, Mr. Wade? Sir? You didn't happen to be involved in that case, did you? Well, you're mighty nice to mention that, Your Honor, but that's the first thing they said is that is evidence of age discrimination. The prima facie case itself is evidence. And they said that was the first error that this court had made, was discounting the prima facie case, that that is itself evidence of age discrimination, that they took a 65-year-old, presumably qualified person who had done at least, according to them, had done parts of this new job and gave it to a 32-year-old. So that is itself is age, proof of age discrimination. Your Honor, the reason counsel is correct that they did a really excellent job cross-examining Wendy, the secretary, Taylor, about you can't say exactly when these statements were made, but she specified four different positions that he was talking about when he did it. And then she said that it was still occurring when she left, or she clearly implied that, because she said that's the reason I left, because I'm 45 years old. And he had just told me that you're 45 and you still look good for 45. What year did she leave? 14, right before. During the time all this was going on. And she said, I feel like I'm going to be next because she's an older female. Your Honor, there can be discrimination. Your Honor mentioned that one of the decision makers was 50, but he was a man. There can be discrimination, as Your Honor knows, against older females. And that was the whole gist of what she and at least four other employees gave opinions that was going on that they were discriminating against older females. You didn't bring a gender discrimination claim, did you? No, sir, we didn't. But that is itself age discrimination because it discriminates. All men are treated okay, even though they're old. I'm sorry, I'm misstating that. It is age discrimination, Your Honor, to discriminate against older females. That's age discrimination. As far as what I think is our most powerful evidence is that of Wendy, Your Honor. And the reason I say that is because a jury can infer that if a decision maker is prejudiced against older people, it is more likely than would otherwise be the case that he would be prejudiced against a 65-year-old woman. It doesn't. The fact that he didn't particularly manifest any he said that the 60-year-old nurse administrator was too old, and the lawyer who had just turned 40 was too old, and that the nurses had to be young to be able to move about fast. Do you disagree with the recitation given us by counsel for defendant that Taylor met with Morgan? We've got to eliminate two positions. Morgan comes back and says, well, these are the two positions that are going to be eliminated, and Holland, I'm sorry, I said Taylor. Holland met with Morgan. They decided on Morgan's recommendation two positions would be eliminated. Morgan comes back to Taylor, Holland, and says, these are the two. And Holland says, okay, can we maximize retirement benefits? Where is, what's wrong with that? That's not the way I understood it happening, Your Honor. Here's a decision was made, a decision was made that not we're going to eliminate two positions, but we're going to combine two positions into one position. That was the decision. And who testified to that? Holland, Holland, Lafayette, there are others. So they, that, that, whatever, whatever the decision was made, then what happened next? Then what happened next is they told her she was going to retire. When you say they, you mean Morgan and? I mean, Morgan was, Morgan told her, and there was another person present. The HR person? Yes. All right. Then Morgan goes back to Holland and says. That's not clear from the record, Your Honor. The only thing that's clear from the record is that Holland and Morgan conferred. It's not clear from the record of who goes back when. But you can take it from Morgan's testimony that the overall plan was that we're going to focus on higher salaried people and people eligible for retirement. That's what he said. And, Your Honor, there's been a lot of talk about, of course, nobody has said, there's no evidence that Holland was doing anything for a good purpose. His purpose was that he just preferred younger women. That's the evidence. Now, there is evidence from which you could say that Morgan had a good attitude about it or was doing it for good reasons. That is, it's easier for you, you know, you can get your retirement, so it's easier for you than it is young people. I don't understand that to be a defense to the Age Discrimination Act. I mean, Congress made the decision that older people are going to be protected, and it's not left to the employer to say, well, for humanitarian reasons, I think we ought to get rid of older people or people eligible for retirement. Thank you, counsel. Your time has expired. Thank you, Your Honor. Thank you. The court will take this matter under advisement. We will take a 10-minute recess at this time.